

**FILED**
**May 29, 2020**
**03:03 PM(CT)**
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MURFREESBORO

| | |
|---|---|
| **KRISTEN SCHUBERT,** ) | **Docket No.: 2018-05-1213** |
| **Employee,** ) | |
| **v.** ) | |
| ) | |
| ) | |
| **CURAHEALTH BOSTON, LLC,** ) | **State File No.: 87914-2018** |
| **Employer,** ) | |
| **And** ) | |
| ) | |
| **PMA INS. GROUP,** ) | **Judge Robert Durham** |
| **Insurer.** ) | |

---

## COMPENSATION HEARING ORDER

---

The Court held a Compensation Hearing on May 22, 2020, to determine whether Ms. Schubert's cervical disc herniation arose primarily out of a work-related incident on August 28, 2018. As outlined below, the Court holds that Ms. Schubert did not prove by a preponderance of the evidence that it did.

### History

Ms. Schubert, a registered nurse, worked as a "nurse manager" for Curahealth. She alleged that on August 28, 2018, she attempted a "solo-lift" to pull a patient toward the head of her bed. As she did, she felt pain in her right shoulder but considered it to be only a pulled muscle. She said the discomfort was no more than typical aches and pains a nurse might experience. No one witnessed the event, and she did not notify anyone at Curahealth of this alleged incident before she finished her shift.

Ms. Schubert stated that she had a typical night at home until she awoke with intense pain in the right side of her neck that radiated to her hand. She claimed to have never experienced these symptoms before. Ms. Schubert went to work the next day and told her supervisors about the symptoms. She denied engaging in any non-work-related strenuous activities on or around the 28th. Ms. Schubert conceded that she told her supervisors she had no idea how her injury happened.

The following day, Ms. Schubert went to a clinic. The record from that visit noted complaints of "back pain," but did not address causation. The nurse practitioner gave her medication and lifting restrictions. Ms. Schubert also saw a chiropractor the same day. The initial note did not mention causation. An additional note stated that she suffered from "chronic R sided neck and UB MM spasm that flared up since a couple of days, numbness and tingling to arm and hand."

A week later, Ms. Schubert visited another urgent care clinic, where she saw Physician Assistant Joseph Weatherby. PA Weatherby's note stated that Ms. Schubert claimed she "woke up from sleep and felt like she had a cramp in her neck." It did not reference a work-related injury. He referred Ms. Schubert for an MRI, which revealed a large, right disc herniation at C6-7. He then recommended her to Dr. George Lien for a neurosurgical evaluation.

Before her visit with Dr. Lien, Ms. Schubert returned to PA Weatherby on September 8 for additional pain medication. On exam, he noted some strength loss in her right arm. He diagnosed right cervical disc prolapse with radiculopathy and wrote a work-excuse stating she could not lift due to a "spinal disc protrusion."

Ms. Schubert testified that even after this visit, she "had no idea" what her MRI revealed, nor did she "necessarily" know that she might require surgery. She also stated that she had not reported an injury to Curahealth at this point because after her initial flare-up, her symptoms subsided and she felt they were only "normal" aches and pains experienced by any nurse.

Dr. Lien saw Ms. Schubert on September 11. The note stated that she "denied any antecedent trauma." Ms. Schubert testified that after several questions from Dr. Lien, they concluded that the herniation occurred with the lifting event. Dr. Lien recommended a cervical fusion.

The next day, Ms. Schubert notified her supervisors that she believed she suffered a work injury on August 28 and wished to file a claim. A week later, Curahealth offered her a panel of orthopedists that included Dr. Tarek Elalayli.

Dr. Elalayli saw Ms. Schubert on October 29, 2018. She told him that on August 28, she felt immediate pain in the right side of her neck when she pulled on a "drawsheet" to move a patient lying in bed. She said that by the next day, she was suffering severe pain that radiated to her right arm. Dr. Elalayli reviewed her MRI, and noting the large herniation at C6-C7, recommended a cervical fusion.

Following the visit, Curahealth denied Ms. Schubert's claim. Dr. Elalayli performed the fusion under Ms. Schubert's personal health insurance. He kept her off work

until March 20, 2019, and placed her at maximum medical improvement on May 2, 2019. He assigned a seven percent whole-body impairment.

As to causation, Dr. Elalayli testified on both direct and cross-examination that if Ms. Schubert told the truth when she relayed her history to him, it was his opinion that the herniation arose primarily out of and in the course and scope of her employment. He stated that lifting patients was consistent with her injury, and he doubted that a herniated disc could have happened in her sleep. On the other hand, if Ms. Schubert were not telling the truth about the work incident, he did not believe the herniation was work-related.

Paul Stone, Ms. Schubert's boyfriend, also testified. He had lived with Ms. Schubert for the last five years and worked as a licensed practical nurse at Curahealth on August 28. He stated that he could not remember Ms. Schubert undertaking any strenuous activity on or before the 28th. On that evening, they ate dinner, watched television, and then went to bed. Ms. Schubert did not say anything to him about hurting her neck or shoulder at work, and she moved normally. He confirmed that she woke around one a.m. complaining of severe right neck and shoulder pain. She did not mention a work injury then or the next morning.

Mr. Stone recalled that, as Ms. Schubert's symptoms worsened despite time and medication, he grew increasingly concerned. However, he could not remember Ms. Schubert mentioning a work injury until she discussed it with Dr. Lien, and they "put it all together." Finally, he believed Ms. Schubert to be a credible, truthful person.

The parties stipulated that August 28, 2018, was the alleged injury date and that Ms. Schubert provided statutory notice. They agreed to a compensation rate of $899.02 and that Ms. Schubert missed 20.29 weeks of work. They also agreed to Dr. Elalayli's seven percent whole-body impairment and that Ms. Schubert would not be entitled to increased permanent partial disability benefits. Finally, the parties stipulated that Dr. Elalayli's treatment was reasonable and necessary and, if the injury were compensable, Ms. Schubert's health insurance is entitled to $23,100.75 in reimbursement.[1]

### Findings of Fact and Conclusions of Law

Ms. Schubert has the burden of proving the essential elements of her workers' compensation claim by a preponderance of the evidence. *Scott v. Integrity Staffing Solutions*, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). The parties agree that the only disputed issue is whether Ms. Schubert met her burden in proving that she sustained a work-related injury to her cervical spine on August 28, 2018. After considering the record and the testimony, the Court holds that Ms. Schubert did not satisfy her burden of proof.

---

[1] Except for Ms. Schubert's motion for attorney's fees, the parties stipulated to all other potential issues.

Since she was the only witness to the alleged work incident, Ms. Schubert's credibility is the key factor in determining whether she proved causation. In *Kelly v. Kelly*, 445 S.W.3d 685, 694-695 (Tenn. 2014), the Supreme Court set out the criteria trial courts should use in assessing witness credibility. Trial courts should consider whether a witness is "calm or agitated, at ease or nervous, self-assured or hesitant, steady or stammering, confident or defensive, forthcoming or deceitful, reasonable or argumentative, honest or biased." *Id.*

During her testimony, Ms. Schubert appeared nervous. Her voice was often tremulous and without much volume. She frequently fluttered her eyelids and often looked away as she gave her testimony. She seemed evasive when answering certain critical questions, such as those related to causation. She was more confident in tone, volume, and body language when giving undisputed facts. Based on these observations, the Court was not persuaded by Ms. Schubert's demeanor to find her credible as to causation.

Ms. Schubert's testimony, along with the medical records, confirmed the Court's doubt as to her account of the alleged workplace incident. She admitted that on August 28, she did not tell anyone at work about hurting her shoulder. She also did not tell her boyfriend about a work injury that evening, not even after she woke him during the night in extreme pain, nor did she say anything the next morning.

At work, she told her supervisors about her symptoms but did not tell them about the lifting incident. Instead, she told them that she did not know how the injury happened. She saw three different health care providers before seeing Dr. Lien, but she never mentioned a work incident. She stated that it wasn't until consulting with Dr. Lien that she finally linked her condition to the August 28 event; however, Dr. Lien's note specifically stated that she "denied any antecedent trauma."

Ms. Schubert's history compelled her to walk a tightrope between remembering a specific injury and explaining why she didn't tell anyone about it until after the surgery recommendation. She attempted to do so by stating that since her symptoms abated after that initial flare-up, she did not think it necessary to try and remember a traumatic event that could have caused such an injury.

The Court finds that the record does not support this rationale. Both Ms. Schubert and Mr. Stone are trained nurses with substantial experience. According to the records, she experienced increasing signs of radiculopathy with numbness and weakness as well as increased pain radiating down her arm into her right hand. After the MRI, PA Weatherby scheduled an immediate follow up with a neurosurgeon. When she returned a few days later, he diagnosed a cervical disc protrusion with radiculopathy and wrote her a work excuse stating that she should not be lifting until she saw a neurosurgeon for a "cervical disc protrusion."

Nevertheless, Ms. Schubert maintained that she "had no idea" what the MRI revealed until she saw Dr. Lien, and it was not until he began questioning her that she finally made the connection between the lifting incident and her herniation. The Court finds this statement to be less than credible serves to damage her credibility regarding the alleged lifting incident as well.

In light of the conclusions above, the Court holds that Ms. Schubert failed to meet her burden of proof regarding causation. Thus, the Court denies her claim. Based on this holding, Ms. Schubert's motion for attorney's fees is denied as well.

Absent an appeal, this order shall become final thirty days after issuance. Curahealth shall pay costs of $150 to the Court Clerk within five business days of this order becoming final. It shall also prepare and submit to the Court Clerk a Statistical Data Form within ten days of the order becoming final.

IT IS ORDERED.

**ENTERED May 29, 2020.**

**Robert V. Durham, Judge**
**Court of Workers' Compensation Claims**

**APPENDIX**

Exhibits:

1. Dr. Elalayli's deposition with collective medical records attached.
2. Blue Cross Blue Shield's statement of medical expenses.
3. Pre-Compensation Hearing Statement
4. First Report of Injury

Technical Record:

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Motion for Attorney's Fees
4. Ms. Schubert's Pre-Compensation Hearing Brief
5. Ms. Schubert's Witness and Exhibit List
6. Curahealth's Witness and Exhibit List

## CERTIFICATE OF SERVICE

A copy of this Order was sent as indicated on May 29, 2020.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|---|---|---|---|---|
| Steven Fifield | | | X | steven@rockylawfirm.com |
| Richard Clark | | | X | rclark@eraclides.com |
| Patsy Bumbalough | | | X | Patsy.bumbalough@tn.gov |

/S/ Penny Shrum

**Penny Shrum, Clerk**
**Court of Workers' Compensation Claims**
WC.CourtClerk@tn.gov



<u>Compensation Hearing Order Right to Appeal</u>:

If you disagree with this Compensation Hearing Order, you may appeal to the Workers' Compensation Appeals Board or the Tennessee Supreme Court. To appeal to the Workers' Compensation Appeals Board, you must:

1. Complete the enclosed form entitled: "Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the compensation hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript and file it with the court clerk *within fifteen calendar days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the court clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. The appealing party has *fifteen calendar days* after the date of that notice to submit a brief to the Appeals Board. *See the Practices and Procedures of the Workers' Compensation Appeals Board.*

**To appeal your case directly to the Tennessee Supreme Court, the Compensation Hearing Order must be final and you must comply with the Tennessee Rules of Appellate Procedure. If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry.** *See* **Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies). Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____ ☐ Motion Order filed on _____

☐ Compensation Order filed on_____ ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*



### AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name: _____    2. Address: _____

3. Telephone Number: _____    4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____    Relationship: _____

_____    Relationship: _____

_____    Relationship: _____

_____    Relationship: _____

6. I am employed by: _____

　　My employer's address is: _____

　　My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

9. My expenses are:

Rent/House Payment $ _____ per month     Medical/Dental   $ _____ per month

Groceries         $ _____ per month          Telephone        $ _____ per month

Electricity        $ _____ per month          School Supplies $ _____ per month

Water             $ _____ per month          Clothing           $ _____ per month

Gas               $ _____ per month          Child Care        $ _____ per month

Transportation $ _____ per month          Child Support   $ _____ per month

Car               $_____ per month

Other            $ _____ per month (describe: _____ )

10. Assets:

Automobile            $ _____         (FMV) _____

Checking/Savings Acct. $ _____

House                  $ _____         (FMV) _____

Other                  $ _____         Describe:_____

11. My debts are:

| Amount Owed | To Whom |
| --- | --- |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____

APPELLANT


Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.


_____

NOTARY PUBLIC

My Commission Expires:_____